account of such Member of Company loss and deduction as set forth in such Regulations, taking into account adjustments to reflect book value.

(b) In the event of a permitted sale or exchange of a Membership Interest or an Economic Interest in the Company, the Capital Account of the transferor shall become the Capital Account of the transferee to the extent it relates to the transferred Membership Interest or Economic Interest in accordance with Section 1.704-1(b)(2)(iv) of the Treasury Regulations.

(c) The manner in which Capital Accounts are to be maintained pursuant to this Section 8.03 is intended to comply with the requirements of Code Section 704(b) and the Treasury Regulations promulgated thereunder. If the Company determines that the manner in which Capital Accounts are to be maintained pursuant to the preceding provisions of this Section 8.03 should be modified in order to comply with Code Section 704(b) and the Treasury Regulations, then notwithstanding anything to the contrary contained in the preceding provisions of this Section 8.03, the method in which Capital Accounts are maintained shall be so modified; provided, however, that any change in the manner of maintaining Capital Accounts shall not materially alter the economic agreement between or among the Members as set forth in the Operating Agreement.

(d) Upon liquidation of the Company (or any Member's Membership Interest or Economic Interest Owner's Economic Interest), liquidating distributions will be made in accordance with the positive Capital Account balances of the Members and Economic Interest Owners, as determined after taking into account all Capital Account adjustments for the Company's taxable year during which the liquidation occurs. Liquidation proceeds will be paid within sixty days of the end of the taxable year (or, if later, within one hundred twenty days after the date of the liquidation). The Company may offset damages for breach of this Operating Agreement by a Member or Economic Interest Owner whose interest is liquidated (either upon the withdrawal of the Member or the liquidation of the Company) against the amount otherwise distributable to such Member.

(e) Except as otherwise required in the Act (and subject to Sections 8.01 and 8.02), no Member or Economic Interest Owner shall have any liability to restore all or any portion of a deficit balance in such Member's or Economic Interest Owner's Capital Account.

## 8.04 Withdrawal or Reduction of Members' Contributions to Capital.

(a) A Member shall not receive out of the Company's property any part of its Capital Contribution until all liabilities of the Company, except liabilities to Members on account of their Capital Contributions, have been paid or there remains property of the Company sufficient to pay them.

(b) A Member, irrespective of the nature of its Capital Contribution, has only the right to demand and receive cash in return for its Capital Contribution.

## 8.05 Collateral Security and Guaranties of Company Loans.

(a) The Members understand and acknowledge that it is contemplated that the Company will borrow money from one or more financial institutions or other lending sources to fund its business activities. The Members further understand that, in order to borrow money, the Company's lender(s) may require the personal guaranties of the Members and/or require each Member to pledge his Membership Interest as additional security for the Company's indebtedness. Each Member agrees that he shall, if required by the Company's lender in connection with any borrowing, execute and deliver to such lenders his personal guaranty of the

Company's indebtedness and pledge his Membership Interest as collateral security for such indebtedness. A Member's failure to comply with the provisions hereof upon demand shall constitute a default of such Member. No Member shall receive a credit to his Capital Account as a result of his personal guarantee or pledge given pursuant hereto.

(b) The Company shall indemnify and hold harmless each Member from and against any and all sums paid or losses incurred by a Member on account of his personal guarantee or pledge given to secure Company indebtedness given pursuant hereto. Any sum paid to any lender of the Company pursuant to such personal guarantee or pledge of a Member shall constitute a debt of the Company and shall be reimbursed by the Company to the Member upon written demand, together with interest from the date the sum was paid to the lender to the date of reimbursement thereof, at the rate of 7% per annum, or the highest rate permitted by law, whichever is less

## ARTICLE IX

## ALLOCATIONS, INCOME TAX, DISTRIBUTIONS, ELECTIONS AND REPORTS

9.01 **Allocations of Profits and Losses from Operations.** Subject to the special allocation provisions contained in Section 9.02 hereof, the Net Profits and Net Losses of the Company for each fiscal year will be allocated among the Members in proportion to their respective Percentage Interests.

9.02 **Special Allocations to Capital Accounts.** Notwithstanding Section 9.01 hereof.

(a) No allocations of loss, deduction and/or expenditures described in Code Section 705(a)(2)(B) shall be charged to the Capital Account of any Member if such allocation would cause such Member to have a Deficit Capital Account. The amount of the loss, deduction and/or Code Section 705(a)(2)(B) expenditure which would have caused a Member to have a Deficit Capital Account shall instead be charged to the Capital Account of any Members which would not have a Deficit Capital Account as a result of the allocation, in proportion to their respective Capital Contributions, or, if no such Members exist, then to the Members in accordance with their interests in Company profits pursuant to Section 9.01.

(b) In the event any Member unexpectedly receives any adjustments, allocations, or distributions described in Sections 1.704-1(b)(2)(ii)(d)(4),(5),(6) of the Treasury Regulations, which create or increase a Deficit Capital Account of such Member, then items of Company income and gain (consisting of a pro rata portion of each item of Company income, including gross income, and gain for such year and, if necessary, for subsequent years) shall be specially credited to the Capital Account of such Member in an amount and manner sufficient to eliminate, to the extent required by the Treasury Regulations, the Deficit Capital Account so created as quickly as possible. It is the intent that this Section 9.02(b) be interpreted to comply with the alternate test for economic effect set forth in Section 1.704-1(b)(2)(ii)(d) of the Treasury Regulations.

(c) In the event any Member would have a Deficit Capital Account at the end of any Company taxable year which is in excess of the sum of any amount that such Member is obligated to restore to the Company under Treasury Regulations Section 1.704-1(b)(2)(ii)(e) and such Member's share of minimum gain as defined in Section 1.704-2(g)(1) of the Treasury Regulations (which is also treated as an obligation to restore in accordance with Section 1.704-1(b)(2)(ii)(d) of the Treasury Regulations), the Capital Account of such Member shall be specially credited with items of Membership income (including gross income) and gain in the amount of such excess as quickly as possible.

(d) Notwithstanding any other provision of this Section 9.02, if there is a net decrease in the Company's minimum gain as defined in Treasury Regulation Section 1.704-2(d) during a taxable year of the Company, then, the Capital Account of each Member shall be allocated items of income (including gross income) and gain for such year (and if necessary for subsequent years) equal to that Member's share of the net decrease in Company minimum gain. This Section 9.02(d) is intended to comply with the minimum gain chargeback requirement of Section 1.704-2 of the Treasury Regulations and shall be interpreted consistently therewith. If in any taxable year that the Company has a net decrease in the Company's minimum gain, and the minimum gain chargeback requirement would cause a distortion in the economic arrangement among the Members and it is not expected that the Company will have sufficient other income to correct that distortion, the Managers may in their discretion (and shall, if requested to do so by a Member) seek to have the Internal Revenue Service waive the minimum gain chargeback requirement in accordance with Treasury Regulation Section 1.704-2(f)(4).

(e) Items of Company loss, deduction and expenditures described in Code Section 705(a)(2)(B) which are attributable to any nonrecourse debt of the Company and are characterized as partner (Member) nonrecourse deductions under Section 1.704-2(i) of the Treasury Regulations shall be allocated to the Members' Capital Accounts in accordance with Section 1.704-2(i) of the Treasury Regulations.

(f) Beginning in the first taxable year in which there are allocations of "nonrecourse deductions" (as described in Section 1.704-2(b) of the Treasury Regulations) such deductions shall be allocated to the Members in accordance with, and as a part of, the allocations of Company profit or loss for such period.

(g) In accordance with Code Section 704(b)(1)(A) and Section 1.704-1(b)(2)(i)(iv) of the Treasury Regulations, if a member contributes property with a fair market value that differs from its adjusted basis at the time of contribution, income, gain, loss and deductions with respect to the property shall, solely for federal income tax purposes, be allocated among the members so as to take account of any variation between the adjusted basis of such property to the Company and its fair market value at the time of contribution.

(h) Pursuant to Code Section 704(c)(1)(B), if any contributed property is distributed by the Company other than to the contributing Member within five years of being contributed, then, except as provided in Code Section 704(c)(2), the contributing Member shall be treated as recognizing gain or loss from the sale of such property in an amount equal to the gain or loss that would have been allocated to such Member under Code Section 704(c)(1)(A) if the property had been sold at its fair market value at the time of the distribution.

(i) In the case of any distribution by the Company to a Member or Economic Interest Owner, such Member or Economic Interest Owner shall be treated as recognizing gain in an amount equal to the lesser of,

(1) the excess (if any) of (A) the fair market value of the property (other than money) received in the distribution over (B) the adjusted basis of such Member's Membership Interest or Economic Interest Owner's Economic Interest in the Company immediately before the distribution reduced (but not below zero) by the amount of money received in the distribution, or

(2) the Net Precontribution Gain (as defined in Code Section 737(b)) of the Member or Economic Interest Owner. The Net Precontribution Gain means the net gain (if any) which would have been recognized by the distributes Member or Economic Interest Owner under Code Section 704(c)(1)(B) of all property which (1) had been contributed to the Company within five years of the distribution, and (2) is held by the Company immediately before the distribution, if

such property had been distributed by the Company to another Member or Economic Interest Owner. If any portion of the property distributed consists of property which had been contributed by the distributes Member or Economic Interest Owner to the Company, then such property shall not be taken into account under this Section 9.02(i) and shall not be taken into account in determining the amount of the Net Precontribution Gain. If the property distributed consists of an interest in an entity, the preceding sentence shall not apply to the extent that the value of such interest is attributable to the property contributed to such entity after such interest had been contributed to the Company.

(j) In connection with a Capital Contribution of money or other property (other than a de minimis amount) by a new or existing Member or Economic Interest Owner as consideration for an Economic Interest or Membership Interest, or in connection with the liquidation of the Company or a distribution of money or other property (other than a de minimis amount) by the Company to a retiring Member or Economic Interest Owner (as consideration for an Economic Interest or Membership Interest), the Capital Accounts of the members shall be adjusted to reflect a revaluation of Company property (including intangible assets) in accordance with Treasury Regulation Section 1.704-1(b)(2)(iv)(f). If, under Section 1.704-1(b)(2)(iv)(f) of the Treasury Regulations, Company property that has been revalued is properly reflected in the Capital Accounts and on the books of the Company at a book value that differs from the adjusted tax basis of such property, then depreciation, depletion, amortization and gain or loss with respect to such property shall be shared among the Members in a manner that takes account of the variation between the adjusted tax basis of such property and its book value, in the same manner as variations between the adjusted tax basis and fair market value of property contributed to the Company are taken into account in determining the Members' shares of tax items under Code Section 704(c).

(k) All recapture of income tax deductions resulting from the sale or disposition of Company property shall be allocated to the Member or Members to whom the deduction that gave rise to such recapture was allocated hereunder to the extent that such Member is allocated any gain from the sale or other disposition of such property.

(l) Any credit or charge to the Capital Accounts of the Members pursuant to Sections 9.02(b), (c), and/or (d), hereof shall be taken into account in computing subsequent allocations of profits and losses pursuant to Section 9.01, so that the net amount of any items charged or credited to Capital Accounts pursuant to Sections 9.01 and 9.02 shall to the extent possible, be equal to the net amount that would have been allocated to the Capital Account of each Member pursuant to the provisions of this Article IX if the special allocations required by Sections 9.02(b), (c), and/or (d), had not occurred.

9.03 **Distributions.** Except as provided in Section 8.03(d), a Member has no right to demand and receive any distribution in a form other than cash. All distributions of cash or other property shall be made to the Members pro rata in proportion to the respective Percentage Interests of the Members on the record date of such distribution. Except as provided in Section 9.04, all distributions of Distributable Cash and property shall be made at such time as determined by the Managers. All amounts withheld pursuant to the Code or any provisions of state or local tax law with respect to any payment or distribution to the Members from the Company shall be treated as amounts distributed to the relevant Member or Members pursuant to this Section 9.03.

9.04 Limitation upon Distributions.

(a) No distributions or return of contributions shall be made and paid if, after the distribution or return of distribution is made either

(1) the Company would be insolvent; or

(2) the net assets of the Company would be less than zero.

(b) The manager may base a determination that a distribution or return of contribution may be made under Section 9.04(a) in good faith reliance upon a balance sheet and profit and loss statement of the Company represented to be correct by the person having charge of its books of account or certified by an independent public or certified public accountant or firm of accountants to fairly reflect the financial condition of the Company.

9.05 **Accounting Principles.** The profits and losses of the Company shall be determined in accordance with generally accepted accounting principles applied on a consistent basis using the cash method of accounting.

9.06 **Interest on and Return of Capital Contributions.** No member shall be entitled to interest on its Capital Contribution or to return of its Capital Contribution.

9.07 **Loans to Company.** Nothing in this Operating Agreement shall prevent any Member from making secured or unsecured loans to the Company by agreement with the Company.

9.08 **Accounting Period.** The Company's accounting period shall be the calendar year ("Fiscal Year").

9.09 **Records, Audits and Reports.** At the expense of the Company, the Manager shall maintain records and accounts of the operations and expenditures of the Company. At a minimum the Company shall keep at its principal place of business the following records:

(a) A current list of the full name and last known address of each Member and Economic Interest Owner setting forth the amount of cash each Member and Economic Interest Owner has contributed, a description and statement of the agreed value of the other property or services each Member and Economic Interest Owner has contributed or has agreed to contribute in the future, and the date on which each became a Member or Economic Interest Owner;

(b) A copy of the Articles of Organization of the Company and all amendments thereto, together with executed copies of any powers of attorney pursuant to which any amendment has been executed;

(c) Copies of the Company's federal, state, and local income tax returns and reports, if any, for the three most recent years;

(d) Copies of the Company's currently effective written Operating Agreement, and copies of any financial statements of the Company for the three most recent years;

(e) Minutes of every meeting;

(f) Any written consents obtained from Members for actions taken by Members without a meeting; and

(g) Unless contained in the Articles of Organization or the Operating Agreement, a writing prepared by the Managers setting out the following:

(1) The times at which or events on the happening of which any additional contributions agreed to be made by each Member and Economic Interest Owner are to be made.

(2) Any right of a Member or Economic Interest Owner to receive distributions that include a return of all or any part of the Member or Economic Interest Owner's contributions.

(3) Any power of a Member or Economic Interest Owner to grant the right to become an assignee of any part of the Member's or Economic Interest Owner's interest, and the terms and conditions of the power.

9.10 **Returns and Other Elections.** The Managers shall cause the preparation and timely filing of all tax returns required to be filed by the Company pursuant to the Code and all other tax returns deemed necessary and required in each jurisdiction in which the Company does business. Copies of such returns, or pertinent information there from, shall be furnished to the Members within a reasonable time after the end of the Company's fiscal year upon the Members' written request. All elections permitted to be made by the Company under federal or state laws shall be made by the Managers in their sole discretion, provided that the Managers shall make any tax election requested by Members owning a Majority Interest.

9.11 **Tax Matters Partner.** Dennis F. Nardoni is designated the "Tax Matters Partner" (as defined in Code Section 6231), and is authorized and required to represent the Company (at the Company's expense) in connection with all examinations of the Company's affairs by tax authorities, including, without limitation, administrative and judicial proceedings, and to expend Company funds for professional services and costs associated therewith. The Members agree to cooperate with each other and to do or refrain from doing any and all things reasonably required to conduct such proceedings.

## ARTICLE X

## TRANSFERABILITY

10.01 **General.** Except as otherwise specifically provided herein, neither a Member nor an Economic Interest Owner shall have the right, as to all or any part of its Membership Interest or Economic Interest to:

(a) sell, assign, pledge, hypothecate, transfer, exchange or otherwise transfer for consideration, (collectively, "sell"); or

(b) gift, bequeath or otherwise transfer for no consideration (whether or not by operation of law, except in the case of bankruptcy).

10.02 **Right of First Refusal.**

(a) If a selling Member desires to sell all or any portion of its Membership Interest or Economic Interest in the Company to a third party purchaser, the selling Member shall obtain from such third party purchaser a bona fide written offer to purchase such interest, stating the terms and conditions upon which the purchase is to be made and the consideration offered. The selling Member shall give written notification to the remaining Members, by certified mail or personal delivery, of its intention to so transfer such interest, furnishing to the remaining Members a copy of the written offer to purchases such interest.

(b) The remaining Members, and each of them shall, on a basis pro rata to their Percentage Interests or on a basis pro rata to the Percentage Interests of those remaining Members exercising their right of first refusal, have the right to exercise a right of first refusal to purchase all (but not less than all) of the interest proposed to be sold by the selling Member upon the same terms and conditions as stated in the aforesaid written offer to purchase by giving written notification to the selling Member, by certified mail or personal delivery, of their intention to do so within forty-five days after receiving written notice from the selling Member. The failure of the remaining Members to so notify the selling Member of their desire to exercise this right of first refusal within said forty-five day period shall result in the termination of the right of the first refusal and the selling Member shall be entitled to consummate the sale of its interest in the Company, to such third party purchaser, provided that the sale shall be consummated within sixty days following the expiration of the aforesaid forty-five day period.

In the event the remaining Members (or any one or more of the remaining Members) give written notice to the selling Member of their desire to exercise this right of first refusal and to purchase all of the selling Member's interest in the Company which the selling Member desires to sell upon the same terms and conditions as are stated in the aforesaid written offer to purchase, the remaining Members shall have the right to designate the time, date and place of closing, provided that the date of closing shall be within sixty days after written notification to the Selling Member of the remaining Member or Members' election to exercise their right of the first refusal.

(c) As a condition to the Company recognizing the effectiveness of either the purchase of the Selling Member's interest in the Company by a third party purchaser or the gift of an interest in the Company (including an Economic Interest), (subject to Section 10.03) substitution of a new Member, the remaining Members may require the Selling Member, Gifting Member or the proposed purchaser, donee or successor-in-interest, as the case may be, to execute, acknowledge and deliver to the remaining Members such instruments of transfer, assignment and assumption and such other certificates, representations and documents, and to perform all such other acts which the remaining Members may deem necessary or desirable to:

(i) verify the purchase, gift or transfer, as the case may be;

(ii) confirm that the person desiring to acquire an interest in the Company, or to be admitted as a Member, has accepted, assumed and agreed to be subject and bound by all of the terms, obligations and conditions of the Operating Agreement, (whether such Person is to be admitted as a new Member or an Economic Interest Owner);

(iii) maintain the status of the Company as a partnership for federal tax purposes; and

(iv) assure compliance with any applicable state and federal laws including securities laws and regulations.

(d) Any sale or gift of a Membership Interest or Economic Interest or admission of a Member in compliance with this Article X shall be deemed effective as of the last day of the calendar month in which the remaining Members' consent thereto was given, or, if no such consent was required pursuant to Section 10.02(e), then on such date that the donee or successor interest complies with the conditions set forth in Section 10.02(c). The Selling Member agrees, upon request of the remaining Members, to execute such certificates or other documents and to perform such other acts as may be reasonably requested by the remaining Members from time to time in connection with such sale, transfer, assignment, or substitution. The selling Member hereby indemnifies the Company and the remaining Members against any and all loss, damage, or expense (including, without limitation, tax liabilities or loss of tax benefits) arising directly or indirectly as a result of any transfer or purported transfer in violation of this Article X.

10.03 Transferee Not Member in Absence of Unanimous Consent.

(a) Notwithstanding anything contained herein to the contrary (including, without limitation, Section 10.02 hereof), if all of the remaining Members do not approve by unanimous written consent of the proposed sale or gift of the Transferring Member's Membership Interest or Economic Interest to a transferee or donee which is not a Member immediately prior to the sale or gift, then the proposed transferee or donee shall have no right to participate in the management of the business and affairs of the Company or to become a Member. The transferee or donee shall be merely an Economic Interest Owner. No transfer of a Member's interest in the Company (including any transfer of the Economic Interest or any other transfer which has not been approved by unanimous written consent of the Members) shall be effective unless and until written notice (including the name and address of the proposed transferee or donee and the date of such transfer) has been provided to the Company and the nontransferring Member(s).

(b) Upon and contemporaneously with any sale or gift of a Transferring Member's Economic Interest in the Company which does not at the same time transfer the balance of the rights associated with the Economic Interest transferred by the Transferring Member (including, without limitation, the rights of the Transferring Member to participate in the management of the business and affairs of the Company), all remaining rights and interest which were owned by the Transferring Member immediately prior to such sale or gift or which were associated with the transferred Economic Interest shall immediately lapse until either (1) the remaining Members, by unanimous consent, reinstate such rights to the Economic Interest Owner who did not previously obtain the unanimous written consent of the Members or (2) upon the remaining Members, by unanimous written consent, reinstating such rights to a successor or transferee of such Economic Interest Owner.

(c) The restrictions on transfer contained in this Section 10.03 are intended to comply (and shall be interpreted consistently) with the restrictions on transfer set forth in Article 30 of the Act.

## ARTICLE XI

## ADDITIONAL MEMBERS

From the date of the formation of the Company, any Person or Entity acceptable to the Members by their unanimous vote thereof may become a Member in this Company either by the issuance by the Company of Membership Interests for such consideration as the Members by their unanimous votes shall determine, or as a transferee of a Member's Membership Interest or any portion thereof, subject to the terms and conditions of this Operating Agreement. No new Members shall be entitled to any retroactive allocation of losses, income or expense deductions incurred by the Company. The Manager(s) may, at their option, at the time a Member is admitted, close the Company books (as though the Company's tax year has ended) or make pro rata allocations of loss, income and expense deductions to a new Member for that portion of the Company's tax year in which a Member was admitted in accordance with the provisions of Code Section 706(d) and the Treasury Regulations promulgated thereunder.

ARTICLE XII

DISSOLUTION AND TERMINATION

12.01 **Dissolution.**

(a) The Company shall be dissolved upon the occurrence of any of the following events:

(i) When the period fixed for the duration of the Company shall expire pursuant to Section 2.05 hereof,

(ii) by the unanimous written agreement of all Members; or

(iii) upon the death, retirement, resignation, expulsion, bankruptcy or dissolution of a Member or occurrence of any other event which terminates the continued membership of a Member in the Company (a "Withdrawal Event"), unless the business of the Company is continued by the consent of all the remaining Members within ninety days after the Withdrawal Event and there are at least two remaining Members.

(b) Notwithstanding anything to the contrary in this Operating Agreement, if a Member or Members owning Percentage Interest which in the aggregate constitute more than two-thirds of the Percentage Interest vote to dissolve the Company at a meeting of the Company pursuant to Article VII, then all of the Members shall agree in writing to dissolve the Company on the date agreed upon or in the event of no agreement, as soon as possible, but in any event not more than thirty days thereafter.

(c) If a Member who is an individual dies or a court of competent jurisdiction adjudges him to be incompetent to manage his person or his property, the Member's executor, administrator, guardian, conservator, or other legal representative may exercise all of the Member's rights for the purpose of settling his estate or administering his property.

(d) A Member shall not take any voluntary action which directly causes a Withdrawal Event. Unless otherwise approved by Members owning a Majority Interest, a Member who resigns (a "Resigning Member") or whose Membership Interest is otherwise terminated by virtue of a Withdrawal Event, regardless of whether such Withdrawal Event was the result of a voluntary act by such Member, shall not be entitled to receive any distributions in excess of those distributions to which such Member would have been entitled had such Member remained a Member. Except as otherwise expressly provided herein, a Resigning Member shall immediately become an Economic Interest Owner. Damages for breach of this Section 12.01(d) shall be monetary damages only (and not specific performance), and such damages may be offset against distributions by the Company to which the Resigning Member would otherwise be entitled.

12.02 **Winding Up, Liquidation and Distribution of Assets.**

(a) Upon dissolution, an accounting shall be made by the Company's independent accountants of the accounts of the Company and of the Company's assets, liabilities and operations, from the date of the last previous accounting until the date of dissolution. The Managers shall immediately proceed to wind up the affairs of the Company.

(b) If the Company is dissolved and its affairs are to be wound up, the Managers shall:

(1) Sell or otherwise liquidate all of the Company's assets as promptly as practicable (except to the extent the Managers may determine to distribute any assets to the Members in kind),

(2) Allocate any profit or loss resulting from such sales to the Member's and Economic Interest Owners' Capital Accounts in accordance with Article IX hereof,

(3) Discharge all liabilities of the Company, including liabilities to Members and Economic Interest Owners who are creditors, to the extent otherwise permitted by law, other than liabilities to Members and Economic Interest Owners for Distributions, and establish such Reserves as may be reasonably necessary to provide for contingent liabilities of the Company (for purposes of determining the Capital Accounts of the Members and Economic Interest Owners, the amounts of such Reserves shall be deemed to be an expense of the Company),

(4) Distribute the remaining assets in the following order:

(i) If any assets of the Company are to be distributed in kind, the net fair market value of such assets as of the date of dissolution shall be determined by independent appraisal or by agreement of the Members. Such assets shall be deemed to have been sold as of the date of dissolution for their fair market value, and the Capital Accounts of the Members and Economic Interest Owners shall be adjusted pursuant to the provisions of Article IX and Section 8.03 of this Operating Agreement to reflect such deemed sale.

(ii) The positive balance (if any) of each Member's and Economic Interest owner's Capital Account (as determined after taking into account all Capital Account adjustments for the Company's taxable year during which the liquidation occurs) shall be distributed to the Members, either in cash or in kind, as determined by the Managers, with any assets distributed in kind being valued for this purpose at their fair market value as determined pursuant to Section 12.02(b)(i). Any such distributions to the Members in respect of their Capital Accounts shall be made in accordance with the time requirements set forth in Section 1.704-1(b)(2)(ii)(b)(2) of the Treasury Regulations.

(c) Notwithstanding anything to the contrary in this Operating Agreement, upon a liquidation within the meaning of Section 1.704-1(b)(2)(ii)(g) of the Treasury Regulations, if any Member has a Deficit Capital Account (after giving effect to all contributions, distributions, allocations and other Capital Account adjustments for all taxable years, including the year during which such liquidation occurs), such Member shall have no obligation to make any Capital Contribution, and the negative balance of such Member's Capital Account shall not be considered a debt owed by such Member to the Company or to any other Person for any purpose whatsoever.

(d) Upon completion of the winding up, liquidation and distribution of the assets, the Company shall be deemed terminated.

(e) The Manager(s) shall comply with all requirements of applicable law pertaining to the winding up of the affairs of the Company and the final distribution of its assets.

12.03 **Articles of Dissolution**. When all debts, liabilities and obligations of the Company have been paid and discharged or adequate provisions have been made there for and all of the remaining property and assets of the Company have been distributed, articles of dissolution as required by the Act, shall be executed in duplicate and filed with the Illinois Secretary of State.

12.04 **Effect of Filing of Articles of Dissolution.** Upon the filing of articles of dissolution with the Illinois Secretary of State, the existence of the Company shall cease, except for the purpose of suits, other proceedings and appropriate action as provided in the Act. The Managers shall have authority to distribute any Company property discovered after dissolution, convey real estate and take such other action as may be necessary on behalf of and in the name of the Company.

12.05 **Return of Contribution Nonrecourse to Other Members.** Except as provided by law or as expressly provided in this Operating Agreement, upon dissolution, each Member shall look solely to the assets of the Company for the return of its Capital Contribution. If the Company property remaining after the payment or discharge of the debts and liabilities of the Company is insufficient to return the cash contribution of one or more Members, such Member or Members shall have no recourse against any other Member, except as otherwise provided by law.

## ARTICLE XIII

## MISCELLANEOUS PROVISIONS

13.01 **Notices.** Any notice, demand, or communication required or permitted to be given by any provision of this Operating Agreement shall be deemed to have been sufficiently given or served for all purposes if delivered personally to the party or to an executive officer of the party to whom the same is directed or, if sent by registered or certified mail, postage and charges prepaid, addressed to the Member's and/or Company's address, as appropriate, which is set forth in this Operating Agreement. Except as otherwise provided herein, any such notice shall be deemed to be given two business days after the date on which the same was deposited in the United States mail, addressed and sent as aforesaid.

13.02 **Books of Account and Records.** Proper and complete records and books of account shall be kept or shall be caused to be kept by the Managers in which shall be entered fully and accurately all transactions relating to the Company's business in such detail and completeness as is customary and usual for businesses of the type engaged in by the Company. Such books and records shall be maintained as provided in Section 9.09. The books and records shall at all times be maintained at the principal place of business of the Company.

13.03 **Application of Illinois Law.** This Operating Agreement and its interpretation shall be governed exclusively by its terms and by the laws of the State of Illinois, and specifically the Act.

13.04 **Waiver of Action for Partition.** Each Member and Economic Interest Owner irrevocably waives during the term of the Company any right that it may have to maintain any action for the partition with respect to the property of the Company.

13.05 **Amendments.** This Operating Agreement may not be amended except in writing by the affirmative vote of Members holding at least two-thirds of all Percentage Interests. Any amendment changing the Percentage Interests of the Members requires the unanimous vote of the Members.

13.06 **Execution of Additional Instruments.** Each Member hereby agrees to execute such other and further statements of interest and holdings, designations and other instruments necessary to comply with any laws, rules or regulations.

13.07 **Construction.** Whenever the singular number is used in this Operating Agreement and when required by the context, the same shall include the plural and vice versa, and the masculine gender shall include the feminine and neuter genders and vice versa.

13.08 **Headings.** The headings in this Operating Agreement are inserted for convenience only and are in no way intended to describe, interpret, define, or limit the scope, extent or intent of this Operating Agreement or any provision hereof.

13.09 **Waivers.** The failure of any party to seek redress for default of or to insist upon the strict performance of any covenant or condition of this Operating Agreement shall not prevent a subsequent act, which would have originally constituted a default, from having the effect of an original default.

13.10 **Rights and Remedies Cumulative.** The rights and remedies provided by this Operating Agreement are cumulative and the use of any one right or remedy by any party shall not preclude or waive the right to use any other remedy. Said rights and remedies are given in addition to any other legal rights the parties may have.

13.11 **Severability.** If any provision of this Operating Agreement or the application thereof to any person or circumstance shall be invalid, illegal or unenforceable to any extent, the remainder of this Operating Agreement and the application there of shall not be affected and shall be enforceable to the fullest extent permitted by law.

13.12 **Heirs, Successors and Assigns.** Each and all of the covenants, terms, provisions and agreements herein contained shall be binding upon and inure to the benefit of the parties hereto and, to the extent permitted by this Operating Agreement, their respective heirs, legal representatives, successors and assigns.

13.13 **Creditors.** None of the provisions of this Operating Agreement shall be for the benefit of or enforceable by any creditors of the Company.

13.14 **Counterparts.** This Operating Agreement may be executed in counterparts, each of which shall be deemed an original but all of which shall constitute one and the same instrument.

3.15 **Legal Representation and Conflicts of Interest.** The parties hereto acknowledge and agree that, with their knowledge and consent, and their waiver of any conflict of interest, the law firm of Hughes & Associates, P.C., has served and may continue to serve as counsel to (a) Dennis F. Nardoni, and Entities owned or controlled, in whole or in part, by Dennis F. Nardoni ("related Entities"), and (b) the Company in connection with this Agreement and its legal matters. The parties acknowledge that Hughes & Associates, P.C. has not served as counsel to the Members, and does not represent their interests in connection with this Agreement or otherwise. The parties further acknowledge that disputes may arise in the future between the parties hereto and, in connection with such potential dispute(s), (y) confirm each party's waiver, to the fullest extent permitted by law, of any conflict of interest now existing or which may hereafter arise as a result of the representation of the Company by Hughes & Associates, P.C., and (z) consent and agree to Hughes & Associates, P.C.'s continued representation of Dennis F. Nardoni and related Entities, even though such representation may be or could become adverse to the interests of any other party or parties hereto.

IN WITNESS WHEREOF, the parties hereto have caused their signatures, or the signatures of their duly authorized representatives, to be set forth below on the day and year first above written.

MEMBERS:

_____
Dennis F. Nardoni

_____
Tony Faham

_____
Shawni Moshiri

EXHIBIT A

## SCHEDULE OF MEMBERS, CAPITAL CONTRIBUTIONS & PERCENTAGE INTERESTS

| Initial Member | Initial Capital Contributions | Contribution | Percentage Interest |
|---|---|---|---|
| Dennis F. Nardoni | Cash | $200,000 | 33.333% |
| Tony Faham | Cash | $200,000 | 33.333% |
| Shawni Moshiri | Cash | $200,000 | 33.333% |

Initial Manager:

Dennis F. Nardoni

P:\Blue Tab\LIMITED LIABILITY COMPANIES\Operating Agreements\Broadway Tiffany, LLC.041205.final.rtf